THE STATE OF DELAWARE, on the relation of Sudler H. King, Relator, v. CHARLES D. ABBOTT, DALLAS D. CULVER, FRANCIS V. DUPONT, RALPH W. EMERSON, A. FRANK FADER, DONALD P. ROSS, and J. GORDON SMITH, being the members of and constituting the State Highway Department of the State of Delaware, and FRANCIS V. DUPONT, R. HARRY CRAIG and HERBERT BARNES, being the members of and constituting the State Police Pension Board, Respondents.

*(August 29, 1946.)*

PEARSON, J., sitting.

*Stewart Lynch* for the Relator.

*Clair J. Killoran,* Attorney-General, for the Respondents.

Superior Court for New Castle County.

PEARSON, J.

Relator served twenty years as a member of the Delaware State Police. In May, 1944, he was retired upon his own application. The parties are in accord that he is entitled to benefits under an act creating a State Police Pension Board and providing for pensions for retired State Police, 41 *Laws of Del.,* pp. 790-792. The question is how much should his pension be.

The act provides for a retirement fund and directs that any member of the State Police retired as was relator, shall "receive monthly, from the said Fund, an amount equal to one-half of the monthly salary received by such member at the time of his retirement." Relator was being paid $200 a month just before his retirement. This monthly payment was broken down on the payroll records of the Highway Department into three items: $170 as a "base salary"; $15 under the provisions of the "State Police Compensation Plan"; and $15 under the provisions of an act relating to cost of living increases in salary of State employees, 44 *Laws of Del.*, pp. 190-192. The Pension Board determined relator's pension at the rate of $85 per month, being one-half of the $170 "base salary." Relator demanded the monthly sum of $100, being one-half of the total $200 which he had been receiving. Upon the Board's refusal, relator brought this proceeding to require payment of a pension in accordance with his demand.

The parties disagree as to the meaning of the expression "monthly salary received by such member at the time of his retirement," as used in the Pension Act. Specifically, we are called upon to decide whether or not, in computing such "monthly salary" of relator, there should be included either or both amounts of $15 each, which he received as part of the gross monthly payments to him before retirement, by virtue of the Police Compensation Plan and the act concerning cost of living increases.

The legislature has employed the word "salary" as an important term of the measure it establishes for a pension. The sense in which "salary" should be construed is determined by its context, verbal and situational. For some time prior to the adoption of the Pension Act in 1937, there existed a statute authorizing the Highway Department to appoint traffic officers officially known as "State

Police"; and directing that they be classified as "captains, lieutenants, sergeants, corporals and privates, according to the duties assigned to them from time to time by the Department." *Rev. Code of Del.*, 1935, sec. 5747. A related act, found in 35 *Laws of Del.*, p. 169, consists of directions with respect to each of the above ranks of officers that they "shall receive a salary not less than" so many dollars per month. Thus, for a corporal, which was relator's rank before retirement, it provides: "that each of said corporals shall receive a salary not less than One Hundred and Sixty Dollars per month." At the end of this statute, the following words were added by an amendment in 1931, 37 *Laws of Del.*, p. 302: "said salaries to be payable on the first and fifteenth of each and every month." It should be noted that the statute does not prescribe specific amounts as compensation for the various officers; but after setting minimum rates of "salaries," it leaves to the Highway Department the fixing of the precise amount, above such rates, in any particular case. For convenience, the statute will be referred to as the Minimum Salary Act.

■ When the Pension Act was adopted, the Highway Department was, presumably, acting within the authority of the Minimum Salary Act in compensating the State Police. With this background, it seems evident that the word "salary" was used in each act in a usual and ordinary sense of that term: "the recompense or consideration paid, or stipulated to be paid, to a person at regular intervals for services, esp. to holders of official, executive, or clerical positions; fixed compensation regularly paid, as by the year, quarter, month, or week." *Webster's New International Dictionary*, 2d *Ed.*, p. 2203. The undisputed amount of $170 of the $200 monthly payments to relator is within this definition, and it would seem to be for this very reason that that amount may properly be treated as "salary" under the acts.

Let us now take up the disputed amount of $15, paid under the so-called State Police Compensation Incentive Plan. The Highway Department adopted this plan in May, 1942. It begins with a statement of its purposes and refers to certain unsatisfactory conditions in the State Police force. Briefly, these were that promotion of officers was slow; that officers had not been offered an incentive to continue improvement in their qualifications; that there had been no satisfactory method of supplementing their salary; that the Department had not made available a continued training program; that there were few men trained to accept administrative positions. Continuing, we read:

"To eliminate these conditions as far as is practical, the following plan is submitted.

"(a) To create a Police Training Program, with objective of qualifying the individual Officer for promotion in grade, or to give him a rating as Specialist in that field of activity with which he is associated.

"(b) Police administration demands that police training develop, in the individual, and in the Department, the following qualities: A high state of morale, good discipline, health, strength and endurance, technical proficiency, initiative, adaptability, leadership and team work.

"With these objectives in mind, we propose to establish in our Police Training Program, a series of Extension Courses, followed by short in-service training schools. * * *

"The Extension Courses will progress from the elementary to the more advanced subjects and will be given in a series of sub-courses with lessons assignments, and will not be limited to any specific time for completion. A rating of 85% will be considered as passing grade and will qualify the individual for entrance to the training school.

"It is contemplated that after an individual has completed his Extension Course he will be given the opportunity to enter the Police Training School, and after qualifying in his final examination with an average of 85%, he will be rated as a Specialist in the subject which he has selected. * * *"

Under the heading "State Police Specialists," these provisions, among others, are made:

"The following table is suggested as an outline of Specialists with rates of pay in each grade.

| Rating | Monthly Pay. |
|---|---|
| Specialist 1st Class Active (Must have passed examination in specific field and be actively engaged in that field) | 10.00 |
| Specialist 2nd Class Active (Must have passed examination in specific field other than the one actively engaged in.) | 5.00 |
| Specialist 3rd Class Inactive (Must have passed examination in specific field other than required in the rating of Specialist 1st or 2nd Class Active) | 2.00 |
| Expert Marksman (Must have passed the examination conducted by Sergeant G. K. Shockley.) | 3.00" |

The plan specifies qualifications for the various specialists' ratings.[1] Relator met the requirements for "rat-

---

[1] By way of illustration, the qualifications for "Specialist 2nd Class" in the field of "Criminal Investigation" are stated as follows: "1. Must have completed the course of instruction as outlined by the Criminal Investigation Division of the Delaware State Police. 2. Must be engaged in active criminal investigation. 3. Must be rated as satisfactory by Officer in charge of Criminal Investigation Division. (A) These ratings will include such remarks as: 1. Dignity of bearing. 2. Physical endurance. 3. Accepting responsibility. 4. Judgment in performance of duty. 5. Respect of his associates. 6. Loyalty to superiors. 7. Subordination of personal interests. 8. Cooperation with other agencies".

ings" which, under the plan, qualified him for "monthly pay" of $15.

Respondents contend that payments under the plan should not be treated as "salary," but as something different which they call "incentive" or "bonus" or "special" payments. And yet, respondents have shown no authority in the Highway Department to make these payments at all unless they be considered part of an officer's "salary" authorized by the Minimum Salary Act. Incidentally, it would appear that the payments made to relator during the year of his retirement were disbursed from funds appropriated by the legislature to pay "Salaries" of State Police. 44 *Laws of Del.*, pp. 150, 151. It is not to be assumed, and the parties do not suggest, that payments under the Compensation Plan were without lawful authority. Indeed, they seem reasonably within the authorization of the Minimum Salary Act in that they were fixed compensation, paid at regular intervals, for services of the holder of an official position who had fulfilled certain established conditions. The reasons which justify treating these payments as "salary" within the meaning of that act, serve likewise to justify their treatment as "salary" within the meaning of the Pension Act.

Respondents argue that the rating as a specialist upon which the incentive pay is based "is in the nature of a mere detail revocable at the will of the Superintendent of Police;" and that since the Superintendent might, shortly before the retirement of an officer, arbitrarily revoke his rating for purely personal reasons, or show undue favoritism, it would be a dangerous and demoralizing precedent to treat the payments as salary, citing *Roddy v. McLaughlin, Police Commissioner*, 219 *App. Div.* 490, 219 *N.Y.S.* 393. The argument and the case cited do not seem persuasive in the situation presented here. The State Highway Department

is authorized to fix salaries and, in the absence of some showing to the contrary, it will be deemed competent to take appropriate steps to avert dangers such as those hypothesized.

Next, we come to the monthly payment of $15, sometimes referred to as the "cost of living increase." This was authorized under an act adopted in 1943, 44 Laws of Del., pp. 190-192, entitled "An Act Making Appropriations for Increases in The Salaries of Employees of The State for The Period Beginning April 1, 1943 and Ending June 30, 1943 and for The Fiscal Years Beginning July 1, 1943 and July 1, 1944, and Ending June 30, 1944 and June 30, 1945 Respectively." By the first section, sums are appropriated for the periods indicated in the title. It is then provided:

"Section 2. The State Treasurer is hereby directed to pay out of the sums appropriated in Section 1 of this Act, as an addition to the basic salary of certain State employees, amounts which shall in no case exceed the following in any one fiscal year, nor one-twelfth thereof in any one month, provided that no such additional sum shall cause the sum of any basic salary plus 'Cost of Living Increase' to exceed a total annual payment of $3,000.00; * * * (c) where the basic salary is in excess of $1,500.00 but not more than $3,000.00, an annual increase of $180.00 * * *.

"Section 3. The term 'basic salary' shall include all salary payments over which any board, commission, department, state officer or other agency of the State of Delaware exercises control and includes on its payroll for payment by the State Treasurer. Any compensation for personal services in the nature of emoluments, fees, honorariums, and the like which is not ordinarily regarded as wages in the commonly accepted sense of the term is to be considered

as salary for the purpose of determining the basic salary hereinabove defined for the purposes of this Act."

Payments under the act are thus described as "increases in the salaries of employees of the State;" and "as an addition to the basic salary of certain State employees." In other sections, there are five references to these payments as "salary increase(s)." To the extent that the labeling of them is significant, they obviously fall within the description "salary" in the Pension Act.

Apart from this, these payments have the earmarks of "salary" in the ordinary sense previously considered. They represented recompense or fixed compensation paid relator at regular intervals for services which he rendered as the holder of an official position.

Respondents urge that payments of the "Cost of Living Increase" were temporary and for this reason should not be treated as "salary" within the meaning of the Pension Act. By temporary, I assume they refer to the fact that the appropriations to pay them were made for limited, consecutive periods; the first beginning April 1, 1943, and the last ending June 30, 1945. A moment's reflexion will make manifest that an undertaking to pay compensation at a specified rate for a limited period to one employed for an indefinite term is not incompatible with the notion of "salary." The increases were payable at the time of relator's retirement in May 1944. It is the amount of the monthly salary at that time, not what was received sometime before or what would otherwise be received after retirement, which the statute makes determinative in computing the pension. We are bound to accept and follow the statutory prescription. The "temporary" aspect of the salary increases seems insufficient, particularly in view of what has been said about them above, to remove them from the scope of the descrip-

tion "salary" in the Pension Act. They should, therefore, be treated as a part of relator's salary in determining the amount of his pension.

An order will be entered in accordance with this opinion.